# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ROGER A. SCHWER,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-1110
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Roger A. Schwer, brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying plaintiff's application for supplemental security income (SSI). This

matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's

response in opposition (Doc. 13), and plaintiff's reply memorandum (Doc. 16).

## I. Procedural Background

Plaintiff protectively filed his application for SSI in May 2013, alleging disability since

January 17, 2007, due to a crushed vertebrae, stomach hernia, and Nissen surgery. The

application was denied initially and upon reconsideration. Plaintiff, through his non-attorney

representative, requested and was afforded a video hearing before administrative law judge

("ALJ") James M. Martin on August 19, 2015. Plaintiff and a vocational expert ("VE")

appeared and testified at the video hearing before the ALJ. On September 10, 2015, the ALJ

issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the

Appeals Council was denied, making the decision of the ALJ the final administrative decision of

the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920 (b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

## B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since May 21,
> 2013, the application date (20 CFR 416.971, *et seq*).
>
> 2. The [plaintiff] has the following severe impairments: degenerative disc disease
> (DDD) of the cervical spine disorder status-fusion; lumbar DDD, and
> diverticulitis (20 CFR 416.920(c)).
>
> 3. The [plaintiff] also has the following non-severe impairments: history of hernia
> repair surgeries and mild obesity (20 CFR 404.1521 and 416.921).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20
> C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and
> 416.926).
>
> 5. After careful consideration of the entire record, [the ALJ] find[s] that the
> [plaintiff] has the residual functional capacity to perform light work as defined in
> 20 CFR 416.967(b).  In particular, the [plaintiff] can lift or carry up to 20 pounds
> occasionally and 10 pounds frequently.  He can stand or walk for approximately 6
> hours of an 8-hour workday and sit for approximately 6 hours of an 8-hour
> workday with normal breaks.  The [plaintiff] is limited to occasional overhead
> reaching bilaterally, frequent climbing of ramps and stairs, occasional climbing of
> ladders, ropes and scaffolds, frequent balancing, kneeling and crawling and
> occasional stooping and crouching.  He will be off task by requiring proximity
> and ability to use the restroom as needed during the day.
>
> 6. The [plaintiff] is capable of performing past relevant work as a screen printer
> and bagger.  This work does not require the performance of work-related

activities precluded by the [plaintiff]'s residual functional capacity (20 CFR 416.965).

7. The [plaintiff] was born [in] . . . 1961 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[1]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since May 21, 2013, the date the application was filed (20 CFR 416.920(g)).

(Tr. 21-32).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[1] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of light occupations such as sales attendant (400,000 jobs nationally), cleaner/housekeeper (500,000 jobs nationally), and marker (100,000 jobs nationally). (Tr. 31-32, 68-71).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

#### i. *Medical evidence related to plaintiff's spine condition*

Plaintiff went to the Hoxworth Clinic at University Hospital for back pain in January 2007 where it was recommended that he have an MRI and continue with pain medication and physical therapy. (Tr. 201). On March 12, 2007, treatment records from Hoxworth showed that plaintiff had chronic back pain and positive multiple level discogenic hypertrophic change. (Tr. 204). Plaintiff was referred to an orthopedic specialist and told to continue taking prescription pain medications and attending physical therapy. (*Id.*). On July 11, 2007, x-rays of plaintiff's

spine revealed wedging of the T12-L1 vertebrae, degenerative disc disease of the lumbar spine, and metallic densities within the left flank and right hemipelvis. (Tr. 207).

X-rays of plaintiff's lumbar spine on November 14, 2007 showed grossly normal flexion and grossly normal posterior elements. (Tr. 253). The x-rays also showed mild old anterior wedge compressions of T12 and L1 and mild spondylosis at L2-L3, in addition to unchanged remote T12 and L1 compression factures. (*Id.*).

Plaintiff sought treatment for low back pain at the University Hospital Orthopedic Clinic on November 14, 2007. (Tr. 255). He reported that he sustained an injury approximately 25 years prior with a possible old T12 compression fracture. (*Id.*). Treatment history notes indicate that plaintiff was previously referred for a lumbar epidural steroid injection; however, he was unable to tolerate the procedure. (*Id.*). An examination revealed that plaintiff was tender to palpation over the entire lumbar spine, as well as the paraspinous muscles on the left. (*Id.*). He was able to stand on his heels and toes. (*Id.*). He walked without an antalgic gait. (*Id.*). Plaintiff's muscle strength was 5/5 and equal in all muscle groups. (*Id.*). He denied paresthesias of the lower extremity. (*Id.*). He had a slight increase in back pain with straight leg raises bilaterally, more so on the right than on the left. (*Id.*). Plaintiff was diagnosed with chronic low back pain and was directed to continue taking pain medications. (*Id.*).

Plaintiff visited the emergency room at Jewish Hospital on January 8, 2011 for low back pain after he slipped and fell on his back while shoveling the driveway. (Tr. 764). A physical examination showed that plaintiff had some midline tenderness of the L1, L2, and L3 areas, as well as the bilateral lumbar paraspinous muscles. Plaintiff had a full range of motion and 5/5 strength of all extremities. (Tr. 765). X-rays taken that same day revealed age indeterminate

20% wedge compression of the L1 and mild degenerative disc disease and mild retrolisthesis at the L4-L5, L5-S1 levels. (Tr. 766). Plaintiff visited the emergency room at Jewish Hospital again on October 12, 2011. (Tr. 734). Examination revealed right paraspinous tenderness in the lower lumbar spine. (Tr. 735). X-rays taken that same day were "normal" and showed no acute abnormalities, and plaintiff was diagnosed with musculoskeletal back pain. (Tr. 736-37).

Plaintiff returned to the emergency room at Jewish Hospital again on August 13, 2012 for low back pain. (Tr. 458-65). A physical examination revealed tenderness in the paraspinous muscles in the lumbar region on palpation. (Tr. 460). Plaintiff was instructed to continue establishing care with his orthopedic surgeons. (*Id.*).

Plaintiff returned to the emergency room at Jewish Hospital for back pain again on June 13, 2013. (Tr. 847). On physical examination, plaintiff could extend his legs almost straight, but had pain in his back while doing so. (Tr. 848). Plaintiff had tenderness with the lightest of palpation of his lumbar spine paravertebrally. (*Id.*). He was discharged from the emergency room with a diagnosis of low back pain and chronic back pain greater than three months duration. (Tr. 849).

Plaintiff commenced treatment with orthopedic surgeon Dr. John Jacquemin of Mercy Health Physicians Orthopedic in August 2013. (Tr. 789). On physical examination, plaintiff exhibited decreased range of motion and tenderness and pain in the cervical and lumbar back. (Tr. 790). An assessment showed cervical radicular pain and lumbar radicular pain. (*Id.*). On August 28, 2013, plaintiff underwent an MRI of his cervical spine, which showed significant degenerative and discogenic reaction at C5-C6 and C6-C7 with significant foraminal compromise. (Tr. 782). Plaintiff returned to Dr. Jacquemin for follow-up visits on September 4,

2013 and October 4, 2013. (Tr. 787-89). Plaintiff was assessed with cervical radicular pain. (Tr. 788-89). Plaintiff visited Dr. Jacquemin again on November 4, 2013. (Tr. 785). Progress notes indicate that plaintiff had physical therapy and epidural injections, and took pain medication, but his pain persisted. (*Id.*). Dr. Jacquemin recommended fusion surgery, which occurred on December 18, 2013. (Tr. 800). At a surgical follow-up with Dr. Jacquemin's physician's assistant, Kelly M. Brueggen, P.A., on December 27, 2013, plaintiff reported that he was "doing very well," but still had some stiffness in his neck. (Tr. 795). X-rays showed stable anterior plate and screw systems at levels C5-6 and C6-7. (*Id.*).

Plaintiff visited Dr. Jacquemin for another post-surgical follow-up examination on February 10, 2014. (Tr. 1008-09). On examination, plaintiff had normal range of motion, reflexes, and gait, and reduced lumbar motion with negative pain on palpation. (Tr. 1008-09). Overall, Dr. Jacquemin noted that plaintiff was "doing ok" and ordered him to wean down on pain medication. (Tr. 1009). On April 10, 2014, plaintiff visited Ms. Brueggen again for neck and back pain. (Tr. 1023). Ms. Brueggen's impressions were herniated nucleus pulposus, status post cervical fusion, and chronic back pain. (Tr. 1024). She ordered an MRI of the lumbar spine, which was conducted on April 21, 2014 and revealed L5-S1 disc desiccation and moderate facet arthropathy and no herniation or significant canal stenosis. (Tr. 957). Plaintiff returned to Ms. Brueggen a week later on April 28, 2014 to review the MRI results and again reported low back pain. (Tr. 1039). Ms. Brueggen assessed low back pain and facet arthropathy. (*Id.*). She referred plaintiff to physical therapy. (*Id.*).

On June 16, 2014, plaintiff returned to Ms. Brueggen for neck and back pain and reported that he had been attending physical therapy with little relief. (Tr. 1054). On examination,

plaintiff had pain bilaterally on extension and reduced range of movement overall. (Tr. 1055). Ms. Brueggen's impressions were chronic back pain, status post cervical spinal fusion, and facet arthropathy in the lumbar region. (*Id.*). Ms. Brueggen referred plaintiff for facet injections. (*Id.*).

Plaintiff was examined by Dr. Jacquemin on July 14, 2014 for a follow-up of neck and back pain, which he reported was the same as before his surgery. (Tr. 1085). On examination, plaintiff was positive for back pain on flexion and positive for pain bilaterally on extension, with a reduced range of movement overall. (*Id.*). Dr. Jacquemin did not recommend further surgery, noting plaintiff's fusion was healed and doubting that injections would help. (Tr. 1086). Dr. Jacquemin continued plaintiff on NSAIDs and mild pain medication. (*Id.*). Dr. Jacquemin also opined plaintiff was "ok for activity as tolerated." (*Id.*).

Plaintiff was examined by Ms. Brueggen again on November 6, 2014 for complaints of constant and severe neck pain. (Tr. 1098). On examination, Ms. Brueggen found decreased range of motion in his neck and full range of motion in his upper extremities, full strength, no edema, and normal deep tendon reflexes. (Tr. 1098-99). She opined that further surgery was unnecessary and recommended physical therapy and pain management. (Tr. 1099).

Plaintiff visited the emergency room at Jewish Hospital on December 19, 2014 for neck pain. (Tr. 961). On physical exam, plaintiff had tenderness of the left paraspinous cervical muscle and decreased lateral bending to the left, but otherwise exhibited a full range of motion of the neck. (Tr. 963). A cervical spine x-ray showed no fracture with fusion of the spine at C5 to C7. (Tr. 964). Plaintiff was given pain medication and ordered to follow up with Dr. Jacquemin.

Plaintiff received pain management treatment from Hadi Akbik, M.D., from January to May 2015. (Tr. 1142-81). On January 21, 2015, a physical examination showed that plaintiff had intact tone and steady gait and could walk on his heels. (Tr. 1146). Plaintiff had a full range of motion in the lumbar region, but had pain with flexion and limited flexion in the cervical region. (*Id.*). Dr. Akbik diagnosed plaintiff with myofascial pain syndrome, cervical postlaminectomy syndrome, and low back pain. (*Id.*). Dr. Akbik recommended physical therapy again and possibly a TENS unit. (*Id.*). Plaintiff returned to Dr. Akbik for pain management again on March 4, 2015, April 1, 2015, and May 6, 2015. (Tr. 1154, 1164, 1175). The physical examinations, assessments, and recommendations remained relatively unchanged since plaintiff's initial appointment on January 21, 2015. (*See id.*).

On June 12, 2015, plaintiff returned to Ms. Brueggen again for neck pain and complained that although he initially had some pain relief after surgery, his pain had recently increased in severity. (Tr. 1129). On examination, plaintiff had a negative Spurling sign, though he had decreased range of motion in his neck with pain at his extremities. (Tr. 1129-30). Ms. Brueggen assessed neck pain and status post cervical spinal fusion. (Tr. 1129). Ms. Brueggen recommended a new cervical MRI and continued pain management and periodic epidural injections. (Tr. 1130).

ii. *Medical evidence related to plaintiff's stomach condition*

Plaintiff's stomach issues were first addressed on April 19, 2007 when he was treated at the Hoxworth Clinic at University Hospital for moderate heartburn and severe gastroesophageal reflux disease ("GERD") symptoms. (Tr. 203). On June 20, 2007, an esophogram revealed a moderate hiatal hernia and gastroesophageal reflux to the mid-esophagus. (Tr. 205). On June

10

29, 2007, plaintiff had Nissen and umbilical hernia repair surgeries. (Tr. 224-241). On July 11,
2007, plaintiff underwent a post-surgical exam and reported abdominal soreness and frequent
diarrhea and stools. (Tr. 209). On July 17, 2007, plaintiff visited the emergency room at
University Hospital for abdominal pain and diarrhea. (Tr. 219). That same day, a CT scan of
plaintiff's abdomen revealed soft tissue thickening at the gastroesophageal junction with no
evidence of bowel obstruction. (Tr. 210-12). Two non-obstructing calculi within the right
kidney and colonic diverticulosis were also observed. (Tr. 212). An upper GI series taken on
July 18, 2007 revealed no evidence of recurrence of a sliding hiatal hernia and no leaks or
extravasation. (Tr. 214). When seen periodically at University Hospital between August and
October 2007, plaintiff reported seven to eight bouts of diarrhea per day and constant nausea.
(Tr. 223, 243, 245).

      On January 16, 2008, plaintiff visited the Hoxworth Clinic at University Hospital
complaining of a new hernia. (Tr. 264). Doctors recommended obtaining a new abdominal CT
scan. (*Id.*). On February 19, 2008, plaintiff underwent a second hernia surgery and returned to
the Hoxworth Clinic for a post-operation visit on March 5, 2008. (Tr. 268). On March 12, 2008,
plaintiff returned to the Hoxworth Clinic with complaints of chronic diarrhea. (Tr. 267).

      On April 13, 2012, plaintiff visited the emergency room at Jewish Hospital with
complaints of left lower quadrant abdominal pain. (Tr. 672). Emergency room notes indicate
that plaintiff was seen the night before and found to have evidence of diverticulitis, but plaintiff
refused to be admitted as was recommended. (*Id.*). On examination, plaintiff had tenderness to
palpation in the lower left quadrant of his abdomen. (Tr. 673). Plaintiff was admitted to the

hospital on IV antibiotics and discharged on April 17, 2012. (Tr. 673, 675). Plaintiff was diagnosed with diverticulitis and GERD. (Tr. 675).

Plaintiff returned to the emergency room at Jewish Hospital on April 24, 2012 with abdominal pain and was admitted. (Tr. 484). On examination, plaintiff exhibited moderate severity reasonably focal left lower quadrant abdominal tenderness. (Tr. 485). Plaintiff was diagnosed with abdominal pain, hypokalemia, GERD, and diverticulitis. (Tr. 487). During plaintiff's stay at the hospital, he underwent Hartmann surgery for diverticulitis with the placement of a colostomy, which was surgically removed on October 5, 2012. (*Id.*; Tr. 380-82).

On June 29, 2012, plaintiff returned to the emergency room at Jewish Hospital with complaints of abdominal pain surrounding his colostomy. (Tr. 468). On examination, plaintiff had tenderness on the right portion of his colostomy without any definitive hernia present. (Tr. 469). Plaintiff's bowel sounds were intact and there were no rebound or peritoneal signs. (*Id.*). His past surgical history was summarized as follows: appendectomy, stomach surgery ("niesan" cut ring in bottom of esophagus), esophageal dilation, and Lap - Hartmans sigmoidectomy colectomy and colostomy. (*Id.*). A CT scan of the abdomen showed no complications in the left lower quadrant colostomy and plaintiff was discharged with pain medication. (Tr. 471).

On September 10, 2012, plaintiff had a colonoscopy that was shown to be within normal limits. (Tr. 435-36). On October 27, 2012, plaintiff visited the emergency room at Jewish Hospital again with complaints of abdominal pain, nausea after eating, and continued drainage from a previous ostomy site. (Tr. 329). On examination, his abdomen was diffusely tender but without true rebounding or guarding. (*Id.*). He was noted to have a very low tolerance for pain and had to be distracted during the examination. (*Id.*). Plaintiff's left lower quadrant wound had

some drainage. (*Id.*). X-rays revealed some dilated small bowel and gas throughout the colon. (Tr. 331).

On March 23, 2013, plaintiff had a CT scan of his abdomen and pelvis, which showed an anterior abdominal wall hernia near the umbilicus with diastases recti containing a loop of small and large bowel without angulation or obstruction. (Tr. 315-16). Plaintiff's prior colostomy site at the left lower quadrant healed with reanastomosis. (*Id.*). The CT scan also found mild hepatomegaly without signs of any mass or ductal dilation grossly. (*Id.*).

On May 10, 2013, plaintiff was admitted to Jewish Hospital for an incisional hernia. (Tr. 272). Plaintiff was assessed with an enlarging abdominal/incisional hernia. (Tr. 276). Plaintiff underwent recurrent incisional hernia repair surgery, which included a bilateral anterior and posterior component release and retromuscular mesh replacement and placement of an On Q pain pump. (Tr. 272).

On October 16, 2013, plaintiff had an EGD (Esophagogastroduodenoscopy) and biopsy for chronic post-prandial nausea and diarrhea. (Tr. 864). Dr. Stephen Goldberg, who performed the EGD, noted plaintiff's postoperative diagnosis as showing no diagnostic abnormality. (*Id.*). Dr. Goldberg also noted that plaintiff's functional abnormality was likely to be intermittent and often does not need any significant medical intervention. (Tr. 862-65).

On January 31, 2015, plaintiff had a CT scan of the abdomen to check his hernia, which revealed minimal diverticulosis without diverticulitis. (Tr. 976). The CT scan also showed no evidence of a recurrent hernia and no evidence of acute abdominal or pelvic abnormality. (*Id.*). On February 18, 2015, plaintiff returned to the emergency room at Jewish Hospital for chronic abdominal pain, GERD, diarrhea, and hypoglycemia. (Tr. 992-94). On examination, plaintiff

had generalized abdominal tenderness. (Tr. 993). An assessment showed chronic abdominal tenderness, GERD, diarrhea, and multiple surgeries as well as episodes of hypoglycemia. (Tr. 994). Plaintiff returned to the Jewish Hospital emergency room on March 18, 2015 for continuing abdominal pain and episodes of hypoglycemia. (Tr. 988). Plaintiff was instructed to follow up with his gastroenterologist and pain management doctor. (Tr. 989).

iii. *Reports from state agency physicians*

On September 29, 2013, state agency physician Linda Hall, M.D., reviewed plaintiff's file. (Tr. 87-91). In her physical RFC assessment, Dr. Hall opined that plaintiff could stand, walk, and sit for approximately six hours in an eight hour workday; frequently climb ramps and stairs, balance, kneel, and crawl; and occasionally climb ladders, ropes, and scaffolds, stoop, and crouch. (Tr. 87-88). In support of the exertional limitations assessed by Dr. Hall, she cited to plaintiff's chronic back pain, chronic neck pain with decreased range of motion, and diverticulitis requiring colectomy and a reversal, and recurrent incisional hernia repair. (Tr. 87).

Upon reconsideration, on March 27, 2014, Gerald Klyop, M.D., reviewed plaintiff's file and took note of plaintiff's December 2013 anterior cervical discectomy and fusion surgery and his progress following the surgery. (Tr. 97-100). Dr. Klyop opined that plaintiff had medically determinable impairments of the spine and gastrointestinal system. (Tr. 97). Dr. Klyop affirmed Dr. Hall's RFC assessment and added that plaintiff was limited to occasional overhead reaching bilaterally. (Tr. 98-100).

Jennifer Bailey, M.D., examined plaintiff for disability purposes on August 20, 2013. (Tr. 770-76). Plaintiff complained of back and neck pain as well as abdominal pain due to diverticulitis. (Tr. 774). He also reported five loose bowel movements per day. (*Id.*). On

14

examination, plaintiff exhibited full strength in all extremities.  (Tr. 770-73).  He had normal

grasp, manipulation, pinch and fine coordination.  (Tr. 770).  Plaintiff had a diminished range of

motion in the cervical spine.  (Tr. 775).  He had a normal gait and arrived with a cane but crossed

the room easily with it.  (Tr. 774).  He was comfortable in both the sitting and standing positions.

(Tr. 775).  Plaintiff's abdomen was obese, soft, nondistended and mildly tender, without

organomegaly.  (*Id.*).  He had normal spine curvature and slight difficulty bending forward at the

waist to 75 degrees.  (*Id.*).  Dr. Bailey found no evidence of radiculopathy from either the

cervical or lumbar spines.  (Tr. 776).  Plaintiff was diagnosed with chronic back and neck pain,

chronic abdominal pain with a history of diverticulitis and abdominal surgery, and exogenous

obesity.  (Tr. 774-76).  Dr. Bailey concluded that plaintiff appears capable of performing at least

mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling,

lifting, and carrying heavy objects.  In addition, plaintiff had no difficulty reaching, grasping, or

handling objects.  (Tr. 776).

   **E.  Specific Errors**

   In his statement of errors, plaintiff argues that the ALJ erred: (1) in failing to find his

chronic diarrhea to be a severe impairment at step two of the sequential evaluation process, (2) in

determining his RFC, and (3) in considering the VE's testimony.  (Doc. 10 at 14-17).

   **1.  The ALJ correctly determined plaintiff's severe impairments**

   Plaintiff alleges that the ALJ erred at the second step of the sequential evaluation process

by failing to consider his "chronic diarrhea" as a severe impairment.  (Doc. 10 at 16).[2]  Plaintiff

argues that the medical evidence of record "sufficiently establishes that Plaintiff has a long

history of chronic diarrhea and abdominal pain dating back to at least his onset date." (*Id.*)

(citing Tr. 202, 209, 222, 243, 245, 267, 484, 672, 774, 864, 993). Specifically, plaintiff

maintains that after undergoing a Nissen repair surgery in June 2007, he started experiencing

problems with nausea and vomiting and reported seven to eight bouts of diarrhea per day with

constant nausea. (*Id.*). Plaintiff alleges that again in 2008, he reported problems with chronic

diarrhea and was hospitalized twice in 2012 for abdominal pain and diverticulitis. (*Id.* at 16-17).

Plaintiff states that in 2013, he reported five loose bowel movements a day at the consultative

examination and underwent an EGD for chronic post-prandial nausea and diarrhea. (*Id.* at 17).

At the administrative hearing, plaintiff testified to having four to seven episodes of diarrhea a

day with chronic nausea. (*Id.*). Plaintiff contends that "[t]he ALJ's decision to not allow proper

limitations for Plaintiff's experience of chronic diarrhea is not supported by the evidence and

warrants reversal." (*Id.*).

The Commissioner argues that because the ALJ found plaintiff had a number of severe

impairments and continued his analysis past step two, any failure to characterize other

impairments as severe was not reversible error. (Doc. 13 at 11). The Commissioner also argues

that "[p]laintiff has not established how any of his impairments, including his chronic diarrhea

and abdominal pain, functionally limit him to a more restricted RFC than that found by the ALJ."

(*Id.*).

The regulations define a severe impairment or combination of impairments as one which

significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §

---

[2] The Court will first consider plaintiff's second assignment of error because it addresses the second step in the five-step sequential analysis.

416.920(c).[3] In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. 20 C.F.R. § 416.922. Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions; the capacity for seeing, hearing and speaking; and the ability to use judgment, respond appropriately to supervisors, and deal with changes in a routine work setting. 20 C.F.R. § 416.922(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Watters v. Comm'r of Social Sec.*, 530 F. App'x 419, 421 (6th Cir. 2013) (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). Although the standard is *de minimis*, the plaintiff bears the burden of demonstrating that he suffers from a medically determinable physical impairment and he must carry his burden by producing "medical signs and laboratory findings." *Id.* (quoting SSR 96-4p, 1996 WL 374187, at *1).

An ALJ's failure to find a severe impairment where one exists may not constitute reversible error where the ALJ finds that the claimant "has at least one other severe impairment and continues with the remaining steps of the disability evaluation." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 326 (6th Cir. 2015) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). "This rule is predicated on the notion that the

---

[3] The regulations defining a severe impairment were amended and renumbered effective March 27, 2017, but were not substantively modified.

ALJ 'properly could consider [the] claimant's [non-severe impairments] in determining whether [the] claimant retained sufficient residual functional capacity to allow [him] to perform substantial gainful activity.'" *Id*. (quoting *Maziarz*, 837 F.2d at 244). The harmless error analysis is appropriate in those instances where "the ALJ properly considered any functional limitations arising from non-severe impairments when crafting his residual functional capacity finding." *Dudley v. Comm'r of Soc. Sec.*, No. 2:16-cv-0682, 2017 WL 2374432, *4 (S.D. Ohio June 1, 2017) (Report and Recommendation) (Kemp, M.J.), *adopted,* 2017 WL 2645962 (S.D. Ohio June 20, 2017) (citation omitted).

In this case, although the ALJ did not find plaintiff's chronic diarrhea to be a severe impairment at step two of the ALJ's five-step sequential evaluation process, the ALJ determined that plaintiff suffered from other severe physical impairments, including degenerative disc disease of the cervical spine disorder status-fusion, degenerative disc disease of the lumbar spine, and diverticulitis. (Tr. 21) (citing 20 C.F.R. § 416.920(c)). In completing the remaining steps of the sequential analysis, the ALJ considered the impact of chronic diarrhea on plaintiff's ability to perform light work. The ALJ noted plaintiff's history of abdominal surgeries and effects from the surgeries and concluded in his RFC determination that plaintiff needed limitations in addition to those found by the state agency physicians, including an allowance of time for plaintiff to use the restroom and an allowance for plaintiff to be off-task for proximity and availability of a restroom. (Tr. 30). Thus, the ALJ adequately considered the limitations from plaintiff's chronic diarrhea in formulating plaintiff's RFC even though he did not find it to be a severe impairment. Although plaintiff challenges the ALJ's assessment of the evidence related to his chronic diarrhea, plaintiff has not shown how inclusion of chronic diarrhea as a "severe" impairment

18

would have changed the ALJ's assessment of his functional limitations. Any error in failing to classify his chronic diarrhea as severe is therefore harmless. *Maziarz*, 837 F.2d at 244. Plaintiff's assignment of error should be overruled.

## 2. Substantial evidence supports the ALJ's RFC determination

Plaintiff argues that the ALJ erred when he "ignored significant medical evidence in support of lesser restrictions which would limit Plaintiff to sedentary work and would indicate a finding of disabled" in his RFC determination. (Doc. 10 at 15). Plaintiff asserts that the ALJ's RFC determination fails to account for medical evidence submitted into the record after the state agency physicians rendered their opinions. (*Id.* at 14). Specifically, plaintiff argues that the ALJ did not consider the MRI evidence of severe degenerative deterioration of the neck and back and a subsequent fusion surgery, which were submitted into the record in August 2013 after the determinations of the state agency physicians. (*Id.*) (citing Tr. 783, 801, 954, 958). Plaintiff contends that the ALJ also failed to consider an April 2014 MRI of the lumbar spine conducted after the determinations of the state agency physicians, which indicated moderate facet arthropathy. (*Id.* at 14-15) (citing Tr. 958). Plaintiff also argues that reversal is warranted because the ALJ did not consider x-rays from 2007, which confirmed multiple level degenerative disc disease, and x-rays from 2011, which confirmed compression fractures of the lumbar spine, moderate degenerative disease, and mild arthrosis. (*Id.* at 15) (citing Tr. 204, 206, 253, 255, 766). Plaintiff further asserts that the ALJ did not consider other findings in the record that purportedly support limiting plaintiff to at least sedentary work, such as plaintiff's increased neck and back pain in 2014 and stomach issues such as diverticulitis and chronic diarrhea, which would render him unable to work due to unscheduled breaks and absences. (*Id.* at 15-16).

In response, the Commissioner contends that the ALJ properly considered the newer medical evidence submitted by plaintiff and the changes in his medical condition, which supported finding a more restrictive RFC than that opined by state agency medical experts Drs. Hall and Klyop. (Doc. 13 at 6). According to the Commissioner, the ALJ considered plaintiff's alleged impairments and included additional restrictions, such as time to use the restroom and a limitation that plaintiff would be off task by requiring proximity and ability to use the restroom as needed during the day, in assessing plaintiff's RFC. (*Id.* at 7). The Commissioner argues that the ALJ properly considered plaintiff's anterior cervical discectomy and fusion surgery, which was also performed after the state agency physicians rendered their opinions. (*Id.*). The Commissioner maintains that Dr. Klyop (whom the ALJ afforded "partial weight") considered plaintiff's December 2013 fusion surgery and his progress after the surgery when he rendered his opinion on reconsideration in March 2014. (*Id.* at 8). The Commissioner further argues that "[p]laintiff's relatively mild objective findings and inconsistent and conservative treatment, after his [fusion surgery], support the ALJ's RFC finding." (*Id.* at 9).

The Social Security regulations vest the ALJ with the responsibility of assessing an individual's RFC. 20 C.F.R. § 416.946(c); 20 C.F.R. § 416.927(d)(2) (the final responsibility for deciding an individual's RFC is reserved to the Commissioner). "Physicians render opinions on a claimant's RFC, but the ultimate responsibility for determining a claimant's capacity to work lies with the Commissioner." *Profitt v. Comm'r. of Soc. Sec.*, No. 1:13-cv-679, 2014 WL 7660138, at *6 (S.D. Ohio Dec. 12, 2014) (Report and Recommendation), *adopted*, 2015 WL 248052 (S.D. Ohio Jan. 20, 2015) (citations omitted). The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. § 416.920b.

*See also Moore v. Astrue*, No. CIV.A. 07-204, 2008 WL 2051019, at *5-6 (E.D. Ky. May 12, 2008) (the ALJ is responsible for assessing the claimant's RFC by examining all the evidence in the record) (citing *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 647 (6th Cir. 2006)). The ALJ can fulfill his obligation "without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999) (citations and internal quotation marks omitted)).

When warranted, the opinions of agency medical and psychological consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Gayheart*, 710 F.3d at 379-80 (citing SSR 96-6p, 1996 WL 374180, at *3). *See also Wisecup v. Astrue*, No. 3:10-cv-325, 2011 WL 3353870, at *7 (S.D. Ohio July 15, 2011) (Ovington, M.J.) (Report and Recommendation), *adopted*, 2011 WL 3360042 (S.D. Ohio Aug. 3, 2011) ("opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight"). The opinions of reviewing sources "can be given weight only insofar as they are supported by evidence in the case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x at 997, 1002 (6th Cir. 2011) (citing SSR 96-6p, 1996 WL 374180, *2) (1996). However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" in order for the opinion of the non-treating source's opinion to be entitled to greater weight than the opinion of a treating source." *Id*. at 1002. The Sixth Circuit has explained:

> There will always be a gap between the time the agency experts review the record
> . . . and the time the hearing decision is issued. Absent a clear showing that the

new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give "'some indication' that he 'at least considered' that the source did not review the entire record. . . . In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (construing *Blakley,* 581 F.3d at 409).

The ALJ gave "great weight" to the determinations by reviewing physicians Drs. Hall and Klyop that plaintiff could perform light work with postural limitations, but partial weight overall to their RFC conclusions. (Tr. 29). The ALJ found that these physicians "did not set forth an allowance of time for plaintiff to use the restroom, which [was] inconsistent with the [plaintiff's] history of abdominal surgeries and the ongoing effects from the same." (Tr. 29-30). Based on the medical evidence submitted after the date of these opinions, the ALJ determined that plaintiff had greater limitations than opined by Drs. Hall and Kylop, which "brought the [plaintiff's] residual functional capacity to less than a full range of light work with postural and manipulative limitations and an allowance to be off task for proximity and availability of a restroom." (Tr. 30). The ALJ gave "significant weight" to the opinion of consultative examiner Dr. Bailey as it was "consistent with a finding that [plaintiff] could perform light work." (Tr. 29). The ALJ noted that based on evidence submitted after Dr. Bailey's opinion, including neck surgery, plaintiff also needed to be limited with overhead reaching. (*Id.*).

The ALJ's RFC determination is supported by substantial evidence. Plaintiff's argument that in accepting the opinions of the state agency physicians, the ALJ ignored pertinent MRI evidence from August 2013 and April 2014 and pertinent evidence related to plaintiff's fusion surgery in December 2013 is not well-taken. (Doc. 10 at 14). The ALJ conducted a thorough review of the medical evidence, including the relevant evidence that post-dated the assessments of the state agency physicians. In doing so, the ALJ considered that the cervical spine MRI from August 28, 2013 showed degenerative and discogenic reaction at C5-C7 with canal stenosis and foraminal compromise. (Tr. 25). The ALJ considered that the lumbar spine MRI from April 21, 2014 showed moderate facet arthopathy at L5-S1, but no herniation or significant canal stenosis. (Tr. 25, 27). The ALJ also considered that plaintiff underwent anterior cervical discectomy and fusion surgery at C5-C7 on December 18, 2013. (Id.). In affording Dr. Bailey's opinion from August 20, 2013, "significant weight," the ALJ recognized that Dr. Bailey had not considered the relevant evidence submitted after the examination, but found that subsequent evidence, including plaintiff's neck surgery from December 2013, warranted greater limitations than Dr. Bailey had determined.

Likewise, in affording the opinions of Dr. Hall and Kylop "partial weight," the ALJ considered that the determinations of these reviewing physicians were not entirely consistent with the medical evidence submitted after their opinions, including plaintiff's history of abdominal surgeries and reasonably concluded that plaintiff needed additional limitations for an allowance of time to use the restroom and allowance to be off-task for proximity and availability of a restroom. (Tr. 29-30). As such, the ALJ's opinion indicates that he considered the fact that Drs. Bailey, Hall, and Klyop had not reviewed the entire record and subjected these opinions to

23

additional scrutiny and applied even greater restrictions than these physicians opined were appropriate. *See Kepke*, 636 F. App'x at 632. The ALJ did not err by crediting the assessments of Drs. Bailey, Hall, and Kylop despite the fact that these physicians did not have a complete record before them. The ALJ subjected these opinions to scrutiny, considered evidence related to plaintiff's severe impairments that post-dated these physicians' reviews, and imposed additional restrictions limiting plaintiff to a reduced range of light work.

Plaintiff's argument that the ALJ, in assessing his RFC, failed to consider x-rays from 2007 and 2011 as well as plaintiff's complaints of increased neck and back pain in 2014 and stomach issues resulting from diverticulitis and chronic diarrhea is also not well-taken. With regard to the x-rays, the ALJ considered that a November 14, 2007 x-ray of the lumbar spine showed unchanged remote T12 and L1 compression fractures. (Tr. 24). The ALJ also noted that a CT scan of plaintiff's lumbar spine conducted on January 8, 2011 showed evidence of remote compression at L1, mild discopathy at L4-S1 without narrowing of the thecal sac or exiting nerve roots, and facet arthrosis at L5-S1. (*Id.*). The ALJ also conducted a thorough review of plaintiff's abdominal issues, noting that plaintiff had a partial colectomy for diverticulitis with a placement of a colostomy on May 1, 2012 and a recurrent hernia repair surgery with mesh placement on May 10, 2013. (*Id.*). The ALJ considered plaintiff's frequent reports of abdominal pain and diarrhea (Tr. 25-27), but found that the objective medical evidence and examination findings did not support a finding of disability. In considering plaintiff's complaints of neck and back pain, the ALJ explained that "treatment notes indicate that the objective and diagnostic findings are not consistent." (Tr. 28). Specifically, the ALJ noted that plaintiff was observed as being in no distress, there was some evidence of drug-seeking behavior, plaintiff had only been

24

placed on NSAIDs and mild pain medications, and plaintiff did not seek regular treatment for his abdominal pain from a primary care provider. (*Id.*). Contrary to plaintiff's assertions, the ALJ reviewed all of the relevant medical evidence in assessing his RFC. The undersigned notes that even where substantial evidence would support a different conclusion or where a reviewing court would have decided the matter differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999). Accordingly, the ALJ's RFC determination is supported by substantial evidence and plaintiff's assignment of error should be overruled.

### 3. The ALJ's hypothetical to the VE supports plaintiff's limitations

In his final assignment of error, plaintiff argues, without citing supporting legal authority, that the ALJ's accommodation for "proximity and ability to use the restroom as needed during the day" is not specific to the vocational expert's testimony. (Doc. 10 at 17). Specifically, plaintiff argues that the ALJ's limitation does not address how long he would need to be off-task. According to plaintiff, the VE testified "that if an individual would need to be off task 2-5 minutes, it would not affect the light jobs listed in response to the ALJ's preceding hypotheticals; a ten minute break in addition to normal breaks would get to a point that an employer would not tolerate; anything more than 10 minutes a day would be work-preclusive." (*Id.*). In response, the Commissioner argues that the ALJ's RFC and hypothetical question to the VE considered all functional limitations that were supported by the record. (Doc. 13 at 12). The Commissioner also argues that the hypothetical question to the VE, which the ALJ relied on to determine steps four and five in the sequential analysis, is supported by substantial evidence. (*Id.* at 13).

In his RFC determination, the ALJ found that plaintiff "will be off task by requiring proximity and ability to use the restroom as needed during the day." (Tr. 23). At the ALJ hearing, the VE testified that plaintiff could perform light jobs such as sales attendant, cleaner, housekeeper, and marker. (Tr. 72-73). Plaintiff's representative asked the VE several questions regarding plaintiff's ability to access and use the restroom at these listed jobs. When asked whether the listed jobs would give plaintiff easy access to the bathroom, the VE testified that he did not think access to the bathroom would be a problem with cleaner, housekeeping, sales attendant, and marker.[4]

Plaintiff's representative asked the VE whether the listed jobs would allow plaintiff to be off-task to use the restroom during the day as needed and allow plaintiff the ability to use the restroom in addition to normal breaks. (Tr. 74). The VE testified:

> Okay. Yeah. I would say, you know, in the kinds of jobs – well, the cleaner, housekeeping, the sales attendant, in addition to your normal breaks, in the morning, afternoon, lunch, if you need to use the restroom a few times during the day, even, you know, normally if you have to go in a hurry, I don't think there would be a problem for those two jobs.

(*Id.*).

Plaintiff's representative also asked the VE whether an employer would tolerate additional breaks lasting anywhere from five to ten minutes twice a day on a regular basis. (Tr. 75-76). In response, the VE testified:

> I would say if the person had two additional five-minute restroom breaks during the course of the day, I don't think that would be a problem with the jobs I listed. And there would be other jobs. If they're taking two additional 10-minute breaks to use the restroom every day, I think you're getting to the limit where you're very close to a limit that, you know, an employer would tolerate. They might tolerate two 10-minute ones. Certainly anything more

---

[4] The VE eliminated the cashier job after determining that it could hinder plaintiff's ability to access the restroom quickly. (*See* Tr. 73-74).

than that and if it was more than two, if it was more than 10 minutes, I would
say no, they would not.

(Tr. 76).

At Step Five of the sequential evaluation process, the burden shifts to the Commissioner
"to identify a significant number of jobs in the economy that accommodate the claimant's
residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r
of Soc. Sec*, 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet her burden of
identifying other work the claimant can perform through reliance on a VE's testimony in
response to a hypothetical question. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

In this case, the ALJ properly relied on a hypothetical to the VE to incorporate all of
plaintiff's supported limitations. Plaintiff misconstrues the VE's testimony as stating that
"anything more than 10 minutes a day would be work-preclusive." (Doc. 10 at 17). As noted
above, the VE testified that the listed jobs of sales attendant, cleaner, housekeeper, and marker
would allow plaintiff to use the restroom a few times during the day in addition to normal
scheduled breaks. (Tr. 74). In addition, the VE testified that an employer *would tolerate* two
ten-minute additional breaks to use the restroom. (Tr. 76) (emphasis added). The ALJ properly
relied on the VE's testimony in determining that plaintiff needed an additional limitation to be
"off task by requiring proximity and ability to use the restroom as needed during the day." (Tr.
23). Although the ALJ did not specify "how long" plaintiff would need to be off-task, the ALJ's
limitation is substantially supported by both the VE's testimony and plaintiff's own testimony.

Plaintiff testified at the ALJ hearing that he averaged four to seven diarrhea episodes *per
day*, not per eight-hour workday, and he needed to use the restroom ten to fifteen minutes after

eating for a period of five minutes. (Tr. 54-55). If plaintiff were referring to the common sixteen hours of wakefulness, he would need fewer than four restroom breaks per eight-hour workday (on a bad day). *See Bigham v. Comm'r*, No. 3:14-cv-1725, 2015 WL 5385912, at *6 (N.D. Ohio Sept. 14, 2015) (holding that the ALJ's RFC and hypothetical question to the VE adequately addressed plaintiff's need for additional restroom breaks). If instead he was referring to a full twenty-four hour day, he would need, on average, fewer than three bathroom breaks per eight-hour workday (on a bad day). *See id.* Regardless, plaintiff's own testimony further substantiates both the VE's testimony that an employer would tolerate two, ten-minute bathroom breaks *in addition to* normally scheduled breaks in the morning, lunch and afternoon and the ALJ's limitation that plaintiff would be off-task to use the restroom as needed. Although the timing of plaintiff's restroom needs would likely be unpredictable, plaintiff does not point to a recommendation from any medical source or any other objective evidence as to how many restroom breaks he might require during an eight hour work day. *See id.* at *17 ("[t]he court is aware, of course, that the timing of such needs would likely be unpredictable; nevertheless, there is no recommendation from any medical source as to how many bathroom breaks [plaintiff] might require during the workday."). The undersigned finds that the ALJ properly relied on the VE's testimony concerning plaintiff's ability to use the restroom during the work day. Accordingly, plaintiff's final assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be closed on the docket

of the Court.

Date: _12/13/17_            _Karen L. Litkovitz_
                                      Karen L. Litkovitz
                                      United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ROGER A. SCHWER,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-1110

Dlott, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).